UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
THE CELLULAR TELEPHONE ASSIGNED
CALL NUMBER (978) 655-0563

Case No. 1:19-mj- 206-014-DL

**FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Paul Karamourtopoulos, being duly sworn, depose and state as follows:

**Introduction and Agent Background**

1.      I submit this affidavit in support of an application for an order pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(c)(1)(A), authorizing agents of the DEA to ascertain the physical location, including but not limited to ongoing E-911 Phase II data or other precise location information (the "Requested Information"), for a T-Mobile telephone assigned phone number (978) 655-0563 (hereinafter "Target Telephone 2" or "TT2"), for a period of thirty (30) days from the date that T-Mobile begins to produce the requested information.  As set forth below, I believe that the user of TT1 and TT2 is a fentanyl and cocaine distributor selling from the District of New Hampshire and the District of Massachusetts, and is using TT1 and TT2 in furtherance of an ongoing conspiracy to distribute controlled substances.

2.      I am a Special Agent with the United States Drug Enforcement Administration (DEA) currently assigned to the DEA Portsmouth Tactical Diversion Squad (TDS).  I have been a DEA Special Agent since March of 1999. Prior to being employed by the DEA, I was a full time Police Officer in Lawrence, Massachusetts, starting in 1988.

1

3.      During my employment with DEA, as well as in my previous law enforcement experience, I have participated in numerous investigations relating to the distribution of controlled substances, including fentanyl and other substances, in violation of the federal antidrug laws (Title 21, United States Code, Sections 846 and 841(a)(1)) and the drug laws of the States of New Hampshire and Massachusetts.  I have received training in the field of narcotics enforcement and investigations.  I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.  I have been the Affiant on affidavits in support of arrest warrants, search warrants, and other applications.  I have also participated in other electronic intercept investigations. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.  I am familiar with the common appearance, packaging, and texture, of narcotics including fentanyl, heroin, oxycodone, and other illegal drugs.  I have debriefed numerous defendants, informants and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations.  Personally, I have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, and acting in an undercover capacity.

4.      Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.  Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, the mails and private delivery services as well as a variety of other means to transport and distribute narcotics and proceeds of narcotics trafficking.  Further, I know that individuals who distribute narcotics often

utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions.  I also know that individuals involved in the distribution of controlled substances frequently talk in code, either during conversations or while utilizing the text messaging function within their cellular telephone, as a means with which to avoid detection and apprehension by law enforcement.  In addition, through investigations and training, I know that drug traffickers may: (a) not maintain cellular telephones for significant periods of time; (b) obtain cellular telephones with false identification information; and/or (c) obtain cellular telephones which do not require the purchaser to disclose personal identification information during the transaction.  Such methods are utilized in order for those involved in illicit drug activity to avoid discovery by law enforcement.

5.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug paraphernalia, drug proceeds, and drug records (as described above) at or in the residences, businesses, and vehicles of relatives, trusted associates, or others.  The reason for this is that drug traffickers know that selling narcotics is illegal and can subject traffickers to lengthy prison sentences.  As a result, drug traffickers often attempt to distance themselves from the drugs that they are selling by either storing them at the homes of friends/associates, or by setting up what is a known as a "stash house," which is typically a residence or commercial location that is registered in the name of another person and which is then being used by drug traffickers to hold narcotics or package them for distribution.  Drug traffickers believe that by setting up such a "stash house," this will shield them from detection by law enforcement.

6.      I have found that through my experience that the search of drug stash houses can result in the collection of valuable evidence of drug traffickers' crimes.  Most importantly, searching a drug stash house generally results in the recovery and seizure of narcotics.  Because drug dealers tend to store these narcotics at a "stash house," I have found that often these narcotics are locked in safes or other places to prevent detection by law enforcement and to prevent them from being stolen by other members of a drug trafficking organization.  In addition, drug traffickers also, at times, keep large quantities of narcotics in their drug stash house because they believe that they do not face risk from law enforcement if the drugs are seized.  Drug traffickers believe that by not living at the drug stash house, law enforcement will not be able to tie the drug stash house to them, which will leave them immune from prosecution.

7.      In addition, I know that searches of drug stash houses can result in the recovery of other "non-narcotic" evidence that is valuable to connect a drug trafficker to the stash house.  In that regard, because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, record keeping is necessary to keep track of amounts paid and owed, and such records will be maintained close at hand to the stash house so as to readily ascertain current balances and to keep track of how proceeds are being expended.  Often drug traffickers keep "pay and owe records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the traffickers' suppliers and the traffickers' dealers.  Additionally, drug traffickers must maintain telephone listings of clients and suppliers to efficiently conduct their drug trafficking business.  Such listings are frequently kept inside their cell phones.

8.      Based on all the facts set forth in this affidavit, I believe that there is probable cause that the Requested Information will constitute or lead to evidence of offenses involving

drug trafficking, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) (the "Target Offenses"), as well as the identification of the user of TT2 and other individuals who are engaged in this conspiracy to distribute controlled substances and the locations at which these offenses are taking place.

9.      The facts in this affidavit are based on my training and experience, my personal knowledge and involvement in this investigation, phone analysis, and information obtained from other agents and witnesses.

10.      The purpose of this affidavit is limited to showing that probable cause exists to support the issuance of a search warrant.  Accordingly, while this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not include each and every fact known by me or other investigators concerning the investigation. That being said, I am not aware of any information that would contradict the information provided here, or to suggest that probable cause does not exist.

11.      This Court has jurisdiction to issue the requested warrant because it is "a court with jurisdiction over the offense under investigation."  18 U.S.C. § 2703(a).

**Probable Cause**

12.      The U.S. Drug Enforcement Administration (DEA) is involved in an ongoing criminal investigation of a multi-state conspiracy to possess with the intent to distribute, and distribute, fentanyl in the Districts of Massachusetts, New Hampshire and Maine.  The source of supply is known only as "Hector FELIZ" and this subject is believed to have used multiple cellular phones in furtherance of this ongoing conspiracy, including most recently (603) 937-7187 (TT1), and (978) 655-0563 (TT2).  To date, the investigation has involved the seizure of evidence, interviews with cooperating defendants, physical surveillance, controlled purchases of

fentanyl, and phone analysis.  Based on the investigation, there is probable cause to believe that a fentanyl distributor known as Hector FELIZ is the user of TT1 and TT2, and that he is using TT1 and TT2 in furtherance of this ongoing conspiracy.

13.     On September 17, 2018, DEA Portsmouth TDS and the New Hampshire State Police were conducting surveillance of Adam WING in the Rochester, New Hampshire area. WING was operating a black Lincoln MKZ in New Hampshire, and agents believed him to be travelling to Denmark, Maine to deliver narcotics. DEA surveillance units determined that WING was travelling in tandem with a second vehicle (2nd vehicle). After observing the 2nd vehicle commit motor vehicle violations, the NHSP attempted to stop the 2nd vehicle. The 2nd vehicle fled from the attempted lawful stop, and eventually crashed in Milton, New Hampshire. The operator of the 2nd vehicle fled from the crash site. A subsequent search of the 2nd vehicle resulted in the seizure of over a kilogram of fentanyl. The operator of the 2nd vehicle was eventually apprehended, and has agreed to cooperate with law enforcement for favorable treatment toward any pending charges.   The person who was the operator of the 2nd vehicle and fled from the 2nd vehicle will hereinafter be referred to as "Confidential Source 1" or "CS1."

14.     A criminal record check indicated that CS1 has been convicted of Sale of Crack Cocaine (1997) and Distribution of Cocaine and Conspiracy to Distribute Cocaine (2003). There is no evidence that CS1 uses drugs.

15.     On September 18, 2018, CS1 was debriefed at the Milton (NH) Police Department, and then later that same day in Manchester, New Hampshire.

16.     CS1 stated that he/she has known, or been dealing with Adam WING for approximately 10 years. According to CS1, WING offered him $10,000.00 to deliver more than a kilogram of fentanyl to a customer living in the area of Bush Rod Road in Denmark, Maine.

(The location was derived from the GPS in CS1's cellular phone and confirmed by CS1.) Bush Rod Road is the same area where surveillance of WING led to the seizure of approximately $45,000 in suspected drug sale proceeds on August 17, 2018. CS1 stated that WING said the customer in Maine received a kilogram or more every 7 to 10 days.

17.     CS1 stated that WING arranged for CS1 to pick up the fentanyl in Lawrence, Massachusetts on September 17, 2018. At approximately 11:20 a.m. that morning, WING sent a text from (603) 361-1433 to CS1. In substance, WING provided the number of the source in a text that read, "his 603-943-2834," and added, "1pm he'll be ready for you." Later in the day, CS1picked up the fentanyl from FELIZ at FELIZ's apartment, located at 22 Woodland St, Apt 204, in Lawrence, Massachusetts. According CS1, FELIZ retrieved the fentanyl from a bedroom.

18.     After picking up the fentanyl, CS1 returned to WING's residence in Manchester, NH, were WING packaged the fentanyl into "fingers" for distribution, or cylinders of pressed powder weighing approximately 10 grams.   According to CS1, 100 fingers and a separate ziplock baggie were then vacuumed sealed all into one package.

19.     Later on September 18, 2018, CS1 was further debriefed in Manchester, New Hampshire. CS1 was able to identify FELIZ when presented a photo array containing 8 photographs. CS1 stated that he/she has known FELIZ longer than WING, and actually introduced WING to FELIZ. CS1 stated that FELIZ recommended that CS1 transport the fentanyl to Denmark, Maine for Adam WING.

*September 24, 2018: Meeting with FELIZ in Lawrence, MA*

20.     On September 24, 2018, at the direction of DEA Agents, CS1 met with FELIZ at FELIZ's residence in Lawrence. CS1 arranged the meeting with FELIZ by contacting FELIZ at (603) 943-2834, the same number that WING had texted to CS1 for FELIZ on September 17,

2018. During the meeting, CS1 told FELIZ that while fleeing from law enforcement officers, CS1 had discarded the fentanyl obtained from FELIZ on behalf of Adam WING. (The fentanyl was, in fact, seized by DEA.) FELIZ subsequently informed CS1 that he would be getting a new phone number and would provide the phone number to CS1.

21.     On September 25, 2018, CS1 received a text message from (603) 937-7187 (TT1), which read "Mi numero new." On October 1, 2018, CS1 called TT1 and had a conversation with FELIZ.

*November 13, 2018: Meeting with FELIZ in Manchester, NH*

22.     On November 13, 2018, CS1 informed DEA Agents that he/she had missed an incoming phone call from TT1. CS1 texted FELIZ at TT1 and informed FELIZ that CS1 was currently unavailable to speak on the phone. CS1 received a text message from TT1 which read "I'm in town." CS1 agreed to meet FELIZ later that afternoon in Manchester, New Hampshire.

23.     At the direction of DEA agents, CS1 met with FELIZ in Manchester, NH. Agents saw FELIZ get into CS1's vehicle, which drove around for a short period. FELIZ was then seen exiting CS1's vehicle, and entering a blue Honda Odyssey (determined to be registered to Antonio FELIZ, 131 Morton Street, Jamaica Plain, Massachusetts).

24.     Following the meeting with FELIZ, CS1 told Agents that when FELIZ got into the CS1's vehicle, FELIZ told CS1 that he was in Manchester dropping off "ounces." CS1 understood this to mean some kind of narcotics. FELIZ asked CS1 to try to retrieve the fentanyl that the CS1 discarded when the CS fled from the NHSP on September 17, 2018. FELIZ told CS1 that FELIZ would get credit from the person he got the fentanyl from, if CS1 could return the fentanyl.

*FELIZ Travels to the Dominican Republic*

25.     On November 30, 2018, CS1 called FELIZ on TT1. FELIZ had previously told CS1 that he would be departing to the Dominican Republic on November 29, 2018, but during the November 30 conversation, FELIZ informed CS1 that he had not yet left. FELIZ asked CS1 to come and visit FELIZ to talk. CS1 advised FELIZ that he/she did not have a car currently and would not be able to meet with FELIZ.  FELIZ informed CS1 that he would be leaving his phone (TT1) with a "friend" and if CS1 needed a car, CS1 could call the "friend" and the "friend" would get CS1 a car. CS1 did not know specifically who the "friend" was, but had met some of FELIZ's friends previously. FELIZ informed CS1 that the prices are "going down." CS1 understood this to be a reference to cocaine prices because before this investigation, CS1 had dealt primarily with FELIZ in cocaine. CS1 also understood FELIZ to mean that the "friend" could supply CS1 with narcotics while FELIZ was in the Dominican Republic.

26.     On January 17, 2019, CS1 sent a text message to TT1. Later that same day, CS1 received an incoming text message from TT1 that read "Hi is hector friend he is in vacation but iuf you need talk to him let me know."

27.     On January 25, 2019, CS received a series of incoming texts from TT2, a phone number that CS1 knew to be used by FELIZ. The incoming text messages to CS1 read "Hi" and "Bro." CS1 responded "R U Back," and received a text from TT2, "No nest week."

28.     On February 20, 2019, and February 27, 2019, CS1 received incoming calls from FELIZ  on TT2, during which FELIZ indicated he was still in the Dominican Republic.

29.     On March 6, 2019, CS1 received a text message from TT1 which read "I'm back."

*Arranging Purchase of Pills from FELIZ*

30.     On May 15, 2019, CS1 contacted FELIZ on TT1 to inquire if FELIZ could

provide CS1 with oxycodone pills (CS1 has reported that he/she had previously obtained

oxycodone pills from FELIZ). FELIZ informed CS1 that oxycodone pills were difficult to get,

but he could access "fake" pills. Agents believed FELIZ was referring to fentanyl pills,

commonly referred to as "dirty 30's," which are made from fentanyl compressed into pill form,

and resemble oxycodone pills.

31.     On June 3, 2019, CS1 received an incoming text message from TT1 that read

"call me." On June 4, 2019, CS1 called FELIZ at TT1. FELIZ asked CS1 when he/she could

"swing by" so FELIZ could show CS1 "something," which agents believed was referring to

narcotics.  On June 7, 2019, CS1 called FELIZ at TT1. FELIZ asked CS1 if he could see CS1

that evening and advised CS1 that he had some "blue things," which agents believed referred to

oxycodone pills for CS1. On June 12, 2019, CS1 called FELIZ at TT2 to ask about the quality of

the pills, and FELIZ responded, "I don't know exactly, you can check it."

32.     On June 13, 2019, DEA agents used CS1 to meet with FELIZ to obtain pills. It

was unclear if FELIZ would be providing the CS with oxycodone pills or "dirty 30's." CS1

entered FELIZ's residence, at Apartment 204, 22 Woodland Street, in Lawrence. Soon after,

surveillance units saw CS1 and FELIZ exit 22 Woodland Street and both get into a blue 2005

Honda Odyssey minivan, which FELIZ had been seen driving on September 13, 2018, in

Manchester, New Hampshire. FELIZ drove. Surveillance followed the Honda Odyssey to a

location in Lawrence, Massachusetts, where agents saw FELIZ exit the vehicle while CS1

remained in it. FELIZ walked out of view of surveillance units, but soon returned to the Honda

Odyssey. FELIZ and CS1 then drove to the area of 22 Woodland Street, where FELIZ entered

the building while CS1 departed the area and was followed to a meet location.

33.     During a debriefing following the meeting with FELIZ, CS1 told Agents that

while he/she was inside the FELIZ's apartment FELIZ made a phone call. Soon after, CS1 and

FELIZ left the building and got into the blue minivan, and drove to a street with which CS1 was

unfamiliar. FELIZ got out of the van and walked away, and CS1 did not see were FELIZ went.

When FELIZ returned to the van, FELIZ drove off and soon after handed CS1 a package

containing blue pills. CS1 told FELIZ that he didn't think that the pills were real. CS1 stated that

FELIZ did not ask for any money for the pills and CS1 believed that the sample was provided so

CS1 could test them (CS1 had previously told FELIZ that he/she was obtaining the pills for a

third party).

*June 17, 2019: First Controlled Purchase of Pills from FELIZ*

34.     On June 17, 2019, DEA agents used CS1 to perform a controlled purchase of

fentanyl pills from FELIZ. During this operation, 100 fentanyl pills were purchased for $1,000.

CS1 had contacted FELIZ on TT1 to arrange the transaction. All contact with FELIZ, including

phone conversations and text messages was recorded. In anticipation of the deal, surveillance

was established in the area of 22 Woodland Street, Lawrence, Massachusetts. While CS1 was

travelling to FELIZ's residence, CS1 called FELIZ.  FELIZ told CS1 that he was in Manchester,

New Hampshire, and directed CS1 to meet him in Manchester at the Aloha Restaurant.

35.     At approximately 8:20 p.m., DEA agents saw CS1 arrive at the Aloha Restaurant.

At approximately 8:23 p.m., surveillance units saw FELIZ arrive at the Aloha Restaurant in a

Honda Accord (determined to be registered to Reyna Amiee FELIZ, 54 Vernon Street,

Manchester, New Hampshire), and walk into the restaurant. Moments later, CS1 entered the

11

restaurant. CS1 exited the Aloha at approximately 8:27 p.m. and drove to a pre-arranged

location, where CS1 gave agents approximately 100 pills that CS1 had purchased from FELIZ.

CS1 told agents that when he/she entered the Aloha restaurant he/she was greeted by FELIZ and

followed FELIZ to the men's room, where FELIZ handed CS1 the pills in exchange for $1000.

*July 25, 2019: Second Controlled Purchase of Pills from FELIZ*

36.     On July 25, 2019, DEA Agents used CS1 to perform a controlled purchase of 200

fentanyl pills from FELIZ.

37.     Leading up to this purchase, CS1 was in contact with FELIZ on both TT1 and

TT2, and met with FELIZ at FELIZ's apartment on July 22, 2019. Although no purchase took

place that day, FELIZ told CS1 that "I have a kilo in Manchester," which CS1 believed to refer

to cocaine.

38.     On July 25, 2019, at the direction of DEA agents, CS1 contacted FELIZ on both

TT1 and TT2.  During one of the conversations, FELIZ directed CS1 to come to his apartment to

purchase the pills.

39.     At approximately 3:58 p.m., DEA agents saw CS1 arrive at the parking lot of 22

Woodland Street in Lawrence, then walk toward the building. At approximately 4:04 p.m., DEA

Agents saw CS1's vehicle leave 22 Woodland Street.

40.     CS1 was followed to a pre-arranged location, where CS1 gave Agents

approximately 200 pills that CS1 had purchased from FELIZ. CS1 stated that on entering

FELIZ's apartment, FELIZ handed the pills to CS1. FELIZ told CS1 that the source of the pills

had 10,000 pills, and had already gotten rid of them. CS1 told FELIZ that he/she had not yet

found anyone interested in purchasing the kilogram of cocaine that FELIZ had referenced on

July 22, 2019.

*September 12, 2019: Third Controlled Purchase of Pills from FELIZ*

41.     On September 12, 2019, DEA Agents used CS1 to perform a controlled purchase of 200 fentanyl pills from FELIZ.

42.     In the days leading up to this purchase, CS1 was in contact with FELIZ on both TT1 and TT2. During one of the conversations, FELIZ directed CS1 to come to his residence to purchase the pills.

43.     On September 10, 2019, at approximately 2:48 p.m., CS1 sent a text to TT2, which read, "I'm free Thursday.200.ill call." CS1 was asking FELIZ for 200 fentanyl pills. At approximately 3:55 p.m., CS1 received an incoming call from TT1, who told CS1 that he had access to 1500 of "the good ones" for $25. CS1 understood this to mean that FELIZ had access to legitimate oxycodone pills for $25 apiece.

44.     On September 11, 2019, CS1 contacted FELIZ at TT1. FELIZ told CS1 that he would make a phone call to determine if the oxycodone pills were still available.

45.     On September 12, 2019, at approximately 10:02 a.m., CS1 contacted FELIZ at phone number TT1. During the conversation, FELIZ told CS1 that the oxycodone pills were no longer available. CS1 asked FELIZ if he could get the "200" (fentanyl pills), and FELIZ stated, "I can make that happen." At 11:18 p.m., CS1 received a call from TT1, in which FELIZ told CS1 "I'm ready." CS1 and FELIZ tentatively agreed to meet somewhere in Manchester, New Hampshire, but FELIZ then sent CS1 a text from TT1 that read, "My car is broke," and "I will be home." CS1 agreed to travel to FELIZ's residence at 22 Woodland Street, Apt. 204, in Lawrence, where he purchased 200 pills.

**Need for Requested Information**

46.     The facts outlined above also show that FELIZ uses TT1 and TT2 to arrange for the sale of narcotics.  Obtaining the Requested Information for TT1 and TT2 will help DEA agents in conducting surveillance of FELIZ, which will also help to identify other customers or sources of supply meeting with FELIZ.  In addition, based on my understanding of drug dealers' use of stash houses, FELIZ's reference to having a kilogram of cocaine in Manchester, NH strongly suggests that FELIZ maintains a stash house for storing narcotics, aside from his primary residence.  I believe that the Requested Information will help agents identify any stash houses FELIZ might use to store narcotics or narcotics proceeds.  I therefore believe that reviewing the data obtained from the Requested Information will assist in revealing current and ongoing violations of federal law involving drug trafficking.

**Relevant Technology and Manner of Execution**

47.     I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a

wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

48.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers, including the call number.

49.     To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifiers of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the location of the Target Cellular Device, even if it is located inside a house, apartment, or other building.

50.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be

the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

### Authorization Request

51.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

52.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of TT1 and TT2 would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  There is reasonable necessity for the use of the technique described above, for the reasons set forth above.  See 18 U.S.C. § 3103a(b)(2).

53.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of TMobile.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with

T-Mobile's services, including by initiating a signal to determine the location of the Target Cell Phone on TMobile's networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

54.     I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the subscriber or customer to whom the materials relate) of the existence of these applications, the warrants, or the execution of the warrants, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b). T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by: giving targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. See 18 U.S.C. § 2705(b).

55.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

56.     I further request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until April 3, 2020, except that the government may produce them in criminal discovery and provide the search warrants to Verizon Wireless. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully Submitted,

/s/Paul Karamourtopoulos
Paul Karamourtopoulos
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
on October 4, 2019:

HON. DANIEL J. LYNCH
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

Information about the location of the mobile phone assigned call number (978) 655-0563

("the Target Cellular Device") with no subscriber information, whose service provider is T-

Mobile US, Inc., a wireless telephone service provider headquartered at 4 Sylvan Way,

Parsippany New Jersey, used by unidentified individuals.

## ATTACHMENT B

All information about the location of the Target Cellular Device described in Attachment A for a period of thirty days from the date that investigators begin receiving data pursuant to this warrant, during all times of day and night, including:

1.      E-911 Phase II data;

2.      GPS data;

3.      latitude-longitude data;

4.      other precise location information; and

5.      data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Cellular Device.

This warrant does not authorize the collection of any content of any communications.

T-Mobile US, Inc. must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information about the location of the Target Cellular Device unobtrusively and with a minimum of interference with T-Mobile US, Inc.'s services, including by initiating a signal to determine the location of the Target Cellular Device on T-Mobile US, Inc.'s network, and at such intervals and times directed by the government.  The government shall compensate T-Mobile US, Inc. for reasonable expenses incurred in furnishing such facilities or assistance.

T-Mobile US, Inc.shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b).  *See* 18 U.S.C.

§ 2705(b).  T-Mobile US, Inc.may disclose this Order to an attorney for T-Mobile US, Inc.for the purpose of receiving legal advice.

**ATTACHMENT C**

Pursuant to an investigation of unidentified individuals for violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute controlled substances) this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1.      radio signals emitted by the Target Cellular Device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2.      radio signals emitted by the Target Cellular Device in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night.  This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property.  The Court finds reasonable necessity for the use of the technique authorized above.  *See* 18 U.S.C. § 3103a(b)(2).

Once the further identification and specific location of the target cellular device has been made, information regarding any other telephones besides the Target Cellular Device will be deleted.

Officers may execute the warrant at any time of the day or night.